STONEROAD *v.* STONEROAD.

*(Supreme Court of New Mexico. January 26, 1887.)*

PUBLIC LANDS—MEXICAN GRANT—SUBSEQUENT SURVEY—PRESTON BECK GRANT.

In 1823 the Mexican government conveyed certain lands in New Mexico by grant calling for specific boundaries. On the cession of the territory to the United States the holder of the grant presented his claim to the surveyor general of the territory for investigation and decision, under the act of congress of July 22, 1854. The surveyor general, in a report which followed the boundaries called for by the grant, recommended that congress confirm the grant, and by act of congress approved June 21, 1860, the same was confirmed according to the report of the surveyor general. The surveyor general afterwards had the grant surveyed, and the survey was approved by him, but *no notice of this survey was given to the claimants*, some of whom were minors and married women. The survey called for boundaries which

did not correspond with those of the grant, but were far within the lines. · *Held,* that the courts were not concluded by the survey from determining the extent and validity of the grant by the Mexican government by specific boundary calls, and afterwards duly examined into, approved, and confirmed; and that the persons holding title under the grant might maintain an action of ejectment to recover lands lying outside the boundaries shown by the survey, but within the boundaries of the grant.

Error to district court, San Miguel county.   Ejectment.

*Catron, Thornton & Clancy* and *H. M. Atkinson,* for defendants in error.

HENDERSON, J.   The defendant in error, George W. Stoneroad, brought an action of ejectment against the plaintiff in error, James P. Stoneroad, to recover possession of two pieces or tracts of land, alleged to be within and constituting a portion of a larger tract known as the "Preston Beck Grant," situated in San Miguel county.   The two pieces of land occupied by defendant at the date of the commencement of this suit, and held adversely by him, lie · within the boundary calls of the Preston Beck grant, but without the limits of a survey thereof, made by the government without notice to the owners, and in which the claimants have never acquiesced.   The cause was tried at the August term, 1885, which resulted in a verdict for the plaintiff, under direction from the court.

Upon the trial the defendant in error introduced in evidence a true copy of the original and official translation of the original *expediente* of said grant, and of all proceedings had, and papers and documents filed, before and with the United States surveyor general for New Mexico, and the decision of the surveyor general approving the grant; a map (Exhibit B) showing the location of the objects given as boundary calls, and the location thereon of the two pieces so held by the plaintiff in error.   He also introduced oral evidence, showing that the land sued for was within the boundary calls of said grant. The plaintiff in error admitted that he was in possession.   He also admitted and stipulated to the correctness of the location of the "Pecos river," a boundary call in the grant, and of the pieces of land held adversely by him, as shown by Exhibit B; and that defendant in error had an undivided one-third of all the right and title of·the original grantee in said grant; that said grant was duly confirmed by congress under the act of June 21, 1860; and that the same had been surveyed without notice to the claimants, and at the time of such survey some of the said claimants were minors and married women, and had not acquiesced in the same.   Plaintiff in error offered nothing in evidence.

On the sixth of December, 1823, Juan Estevan Pino petitioned the governor of the province of New Mexico for a grant of lands in this territory, now a portion of San Miguel county, bounded as follows: On the north by the landmarks of the farm or land of Don Antonio Ortiz, and the table-land of the Aguage de la Yequa; on the south by the Pecos river; on the east by the table-land of Pajarito; and on the west by the point of the table-land of the Chupaines; and on the twenty-third of the same month and year the political chief or acting governor, by direction of the most excellent deputation, made the grant, reciting in the granting decree the same boundaries as set out in the petition of Pino, and directing that the said Pino, as the grantee, be put into possession by the alcalde, which was accordingly in due form done. Pino occupied the land until his death, and subsequently thereto his heirs sold to Preston Beck, who presented the claim to the surveyor general of the territory on May 10, 1855, for investigation and decision, as required by the eighth section of the act of congress of July 22, 1854.

After taking testimony, and after a due consideration of the case, the surveyor general recommended that congress confirm the grant to Preston Beck, Jr.; and by act of congress, approved June 21, 1860, the same was confirmed according to the report of the surveyor general as No. 1.   The surveyor general had the grant surveyed, and the said survey approved by him, November,

1860. No notice, however, of this survey was given to the claimants, so far as the records show. The act of congress of June 21, 1860, confirmed the grant as reported.

Plaintiff in error assigns the following: (1) That the verdict of the jury in said cause was against the evidence, and the weight of the evidence, in said cause; (2) that the court erred in instructing the jury to find a verdict for the plaintiff below in said cause; (3) that the court erred in refusing to instruct the jury in said cause to find a verdict for the defendants; (4) that the court erred in refusing to instruct the jury as asked by the defendant below.

The single question, under the facts stipulated and proven in this case, is, does the survey, made after the grant was confirmed, conclude the court from determining the extent and validity of the grant made by the Mexican government by specific boundary calls, and afterwards, under the act of congress of 1854, duly examined into and approved by the surveyor general, approved by the land department of the United States, and confirmed by act of congress? That the plaintiff in error was in possession and holding two parcels of land embraced within the limits of the Preston Beck grant, as confirmed by congress, if the boundary calls are to govern as to extent, is admitted. It is also admitted that these lands so held by him are without the limits of the survey, but near the line. It is further shown that the pieces so held, as shown by the map, lie some 10 or 12 miles within the limits of the grant, provided the grant is to be upheld as petitioned for and granted by the Mexican government, and of which he was put into judicial possession by the duly-authorized officer of the Mexican government. The surveyor general pursued the same description in his report, and the act of congress confirmed it as reported.

It is conceded by both parties that, where lands are to be surveyed by our government, the rules adopted by the interior department in surveys of grants like the one in question, where boundary calls are given, is to draw a straight line north and south, or east and west, through such point, on the side of the tract of which it constitutes such boundary, to the intersection of the boundaries on the other sides; and where the call is a meanderable object, such as a river, *mesa*, mountain, or arroyo, it should be meandered, to the extent that it constitutes such boundary, within the projected lines of the other sides. See *Ortez Mine Grant*, 2 Copp, Pub. Land Laws, 1276; *U. S.* v. *Soto*, 1 Hoff. L. Cas. 68; Tyler, L. Bound. 29, 187, 188.

It is not shown in the record that Preston Beck, or any person holding under him, ever applied to the government to have a survey made, or for a patent. It has not been urged that there is any act of congress making it obligatory upon the confirmance of a grantor, or those holding under him, to have the grant surveyed, or to call for a patent; nor is it insisted that there was any regulation of the executive department, having the force of law, making it obligatory on the surveyor general to survey such grants after confirmation, in operation at the date of the survey, in 1860.

If we apply the rule above stated, governing the survey of a Mexican or Spanish grant, it is obvious that the plaintiff in error was in possession of lands belonging in part to the defendant in error at the date of the institution of this suit.

The contention on behalf of plaintiff in error is that, after the survey, the defendant in error, and all other claimants under the grant, are concluded by the survey; and that, in an action of ejectment, the survey estops the plaintiff from asserting title to a greater quantity of land than is included in it. In support of this position the case of *Gallagher* v. *Riley*, 49 Cal. 473, and *Boyle* v. *Hinds*, 2 Sawy. 527, are cited.

In *Boyle* v. *Hinds* the Mexican government, in 1839, granted a *rancho*, called "Estero Americano," to Edward Manuel McIntosh. The grant was for two square leagues, within certain designated boundaries, embracing six

or more square leagues. It contained the usual provision for measuring the land, and leaving the surplus to the nation. The grant was approved by the departmental assembly. Afterwards, judicial possession was given by the alcalde of the jurisdiction within which the land was situated. The judicial possession was regular in all respects. This possession embraced six instead of two square leagues. Prior to 1850, McIntosh conveyed his grant to O'Farrell, who, in 1852, presented the grant for confirmation, and it was subsequently confirmed to the extent of two leagues only. It was surveyed and patented for about two leagues. O'Farrell took his patent without objection, and placed it on record in the recorder's office of the county in which the lands were situated. The lands in question lie within the judicial possession given to McIntosh, but without the limits of the final survey and the patent issued to O'Farrell. The patent was issued to O'Farrell after the final decree of confirmation. After that decree the government patented the lands in controversy to Hinds, as a pre-emptor, who was in possession when the suit was brought. In delivering the opinion, SAWYER, J., said: "The plaintiff claims that McIntosh had a perfect Mexican title, and that it was unnecessary for his grantee, O'Farrell, to present his claim for confirmation; that, his title being perfect, congress had no constitutional power to deprive him of his land in case of his failure to present his claim under the act of 1851. Under the view I take, it may be conceded that it was unnecessary to present the claim; but the claimant did present his grant, and submit it to examination, and asked its confirmation under the act of congress. The question as to the genuineness and extent of the grant were litigated between the government and the claimant before a tribunal having jurisdiction to determine them. The grant was confirmed to the extent of two square leagues, and no more. The juridical possession was put in evidence, and the extent of the land to which the claimant was entitled in fact determined. The claimant did not appeal, and the determination became final. He had a right of appeal under the act, and could have gone from court to court, and ultimately had the question directly adjudicated by the supreme court of the United States in that proceeding, whether he had a title to the full extent of the juridical possession or not. The same court would then have passed upon his title in a direct proceeding to establish his claim to the whole that are now called upon to determine the same question collaterally. The law afforded him tribunals to determine this very question between him and the United States. The owner of the grant availed himself of the right afforded by the act of congress, and the question between him and the United States was litigated and determined. If the claimant chose to accept the decision of the inferior tribunal, he is bound by it." It was also held that, by the fifteenth section of the act of 1851, the adjudication between the government and the claimant became final, and must, for that reason, be considered as *res adjudicata.*

The proceedings in the case, ending in a decree limiting the confirmance to two leagues, was clearly judicial, and was final and binding on the parties. In that case the survey and patent but carried out the decree of confirmation. It was for these reasons held that the patent was the final authentic record of the proceedings, and was conclusive evidence between the parties of the extent of the grant, and the correctness of the location. There is nothing in this case to guide or control us in reaching a correct conclusion on the facts presented in the transcript before us. In the case above quoted the owner of the grant submitted his claim to a court of competent jurisdiction, and actually litigated with the United States upon the very question of the extent of his grant under the title derived from Mexico, and the act of juridical possession. The way was open to him, upon an adverse decision, to appeal finally, if necessary, to the supreme court of the United States. He submitted to an adverse decision without appeal, and thereby waived or lost the right to dispute with the government or its grantee the title to any por-

tion of the lands lying without the terms of the decree, survey, and patent.

*Gallagher* v. *Riley, supra,* goes no further than to declare that in Mexican grants, where no juridical possession is given, and the grant is of a quantity of land as distinguished from a particular piece, by specific boundaries, a survey after confirmation by congress is necessary, and is made so by the thirteenth section of the act creating the board of land commissioners, (1851.) WALLACE, C. J., in delivering the opinion, said: "In excluding the proffered evidence, the court below erred. If the survey had become final, as the plaintiff proposed to prove, it was conclusive of the boundaries of the Rancho Laguna de San Antonio. The court below was mistaken in supposing that the confirmation to Bartolome Bojorques was for a 'specific piece of land.' The quantity confirmed was six leagues in superficial area. The land confirmed was to be hereafter surveyed, located, and set apart to the confirmee by the proper authorities of the United States; and if the survey had become final, as the plaintiff offered to show, it was conclusive evidence in the action of the boundaries of the tract confirmed." In the latter case it was agreed that the defendant had possession of lands lying within the *diseno* or map, describing the extent of the grant, but without the survey.

The quantity confirmed in the California grant was six leagues in superficial area, "being the same on which the said petitioner resides, and bordering towards the north-east on lands known in November, A. D. 1845, as the lands of Juan Martin, towards the north-west on Los Dos Piedros; towards the south-west on Los Tomales; and towards the north-east on lands known, at the date of the last mentioned grant, as the lands of Juan Miranda,—the said premises being of the extent of six square leagues." The plaintiff offered to prove that the survey, plat, and field-notes made by the surveyor general of the state of California of said Rancho Laguna de San Antonio, was filed in the office of said surveyor general on the tenth day of March, 1859, and approved by him on said day; that said surveyor general immediately thereafter, to-wit, on the fifteenth day of March, 1859, gave due notice by publication, according to law, that said claim had been surveyed, and a plat thereof made and filed as aforesaid; that no objection had been made; and further offered to show that said survey had become final. The court simply said that if the plaintiff could have proved that the survey was made as required by the statute in force in that state at that time, after due and proper notice to all persons interested in the grant, and that no objection had been made, and the survey was final, it conclusively settled the boundaries of the grant. It will be noticed that the decision was rendered after the act of 1851 was passed, and the parties in interest had submitted to the decision of a tribunal clothed with ample authority to finally settle disputed claims between grant owners and the government of the United States, and as between conflicting or adversary claimants. After the land-board had rendered judgment in cases like the one considered in *Gallagher* v. *Riley,* it became necessary, and was a part of the system adopted, to have a survey made, and assign the quantity to which the claimant was entitled, thereby segregating his claim from the public domain. The final survey became a necessary part of the proceedings in cases of quantity grants, in order to accurately locate the boundaries. Notice of such survey was, however, necessary. The act expressly conferred the power upon the surveyor general to do what he did in that case. His act, done in pursuance of such expressed authority, and upon notice, ought to have bound the claimants. There was no expressed duty imposed by the terms of the act of congress of 1854, creating the office, and defining the duties of the surveyor general of this territory. There is no evidence before us that any notice was ever given by the surveyor general of the territory of his survey in 1860. The stipulation on file shows that no such notice was ever given.

The grant in the case before us was a perfect one, made in 1823, by the Mexican government. This is admitted by plaintiff in error; or, at all events,

he does not offer any objection to it on account of not conforming to some requirement of the laws of Mexico. It covers all the lands lying within certain named and well-known boundaries. The grant or patent made by Bartholome Baca, acting superior political chief of the province of New Mexico, after reciting the power conferred on him, and the previous consent of the most excellent provincial deputation of the territory, proceeds as follows: "I have granted, and by this patent do grant, in the name of the supreme government of the nation, to Don Juan Estevan Pino, the land he solicits on the Gallinis river, which shall be called the 'Hacienda of San Juan Baptista del Ojito del Rio de las Gallinis,' recognizing the boundaries: On the north, the land-marks of the farm of Don Antonio Ortiz, and the table-land of the Aguage de la Yequa; on the south, the Pecos river; on the east, the table-land of Parjarito; and on the west, the point of the table-land of the Chupaines,—on which fixed points you will place formal and well-constructed boundaries, so that in all times to come the dividing line of the land granted to him may be known." The alcalde, in obedience to directions from superior authority, and in strict conformity to law, put the grantee into the juridical possession of the lands embraced in the grant, as lying within the boundaries given. The surveyor general reported this grant for confirmation, following the description contained in the petition of Pino, and the grant from the Mexican government. The act of congress confirms the grant as reported.

In *U. S.* v. *Halleck*, 1 Wall., at page 455, FIELD, J., in passing upon a question of survey in that case, said: "The material question for determination is whether the survey approved conforms to the decree of confirmation. There must be a reasonable conformity between them, or the survey cannot be sustained." The survey here is not, by many miles, in conformity with the boundary calls of the grant and act of confirmation. It is at one point some 10 miles within the line of the grant, when drawn as prescribed by the rules of the interior department. There is no reasonable conformity, and the result is that the survey cannot be sustained, unless for reasons hereafter stated.

In *U. S.* v. *Pico*, 5 Wall. 536, the court said: "Were there any doubt of the intention of the governor to cede all the land contained within the boundaries designated by him, it would be removed by the juridical possession delivered to the grantees. This proceeding involved an ascertainment and settlement of the boundaries of the lands granted by the appropriate officers of the government, specially designated for that purpose, and has all the force and efficacy of a judicial determination. It bound the former government, and is equally binding upon the officers of our government." Such is the purport of the recent decision in the case of *Graham* v. *U. S.*, 4 Wall. 260. See, also, *Leese* v. *Clark*, 18 Cal. 567; *Page* v. *Scheibel*, 11 Mo. 187.

In *Graham* v. *U. S.*, 4 Wall. 259, Mr. Justice FIELD, in speaking of the effect of the juridical possession, used this language: "By this proceeding, called, in the language of the country, the delivery of the juridical possession, the land granted was separated from the public domain, and what was previously a grant of quantity became a grant of a specified tract. The record of the proceeding of this nature must necessarily control the action of the officers of the United States in surveying land claimed under a confirmed Mexican grant."

In the grant to Pino, juridical possession was delivered to him by the description and boundary calls, above stated. The south line was the Pecos river. The survey does not follow the specific and well-defined natural objects named in the grant and act of juridical possession as boundary lines and calls. If the record made by an officer, after delivering possession, is binding upon the officers of our government, it follows that the act of delivering such juridical possession, by such clearly and distinctly defined boundary lines as in

this case, ought to be equally obligatory and binding upon the officers of our government. Had it been uncertain what lands the government of Mexico intended to convey to Pino, or the grant had been of a quantity within defined exterior limits, it would have been necessary for the officer to have measured the lands and fixed boundaries, and to have made some record of the act; otherwise a new survey by our government would have been necessary to separate the granted lands from the public domain. The boundaries given, and the rule for measurement ascertained, it is mathematically certain what lands were granted.

Mr. Justice DAVIS, in *Ryan* v. *Carter*, 93 U. S. 82, in speaking of the act of congress confirming lots and lands in the territory of Missouri to the inhabitants of certain towns and villages, under the act of 1812, said: "It does not require the production of proofs before any commission or other tribunal established for that special purpose, but confirms, *proprio vigore*, the right, title, and claims to the lands embraced within it, and operates as a grant to all intents and purposes. Repeated decisions of this court have declared that such statute passes the title of the United States as effectually as if it contained, in terms, a grant *de novo*, and that a grant may be made by law as well as by a patent pursuant to law."

In *Tameling* v. *United States Freehold, etc., Co.*, 93 U. S. 644, Mr. Justice DAVIS, in passing upon the effect of an act of congress confirming a Mexican grant, said: "Congress acted upon the claim as recommended for confirmation by the surveyor general. The confirmation being absolute and unconditional, without any limitation as to quantity, we must regard it as effectual and operative for the entire tract." The court reaffirmed the doctrine that an act of confirmation passes the title of the United States as effectually as if it contained in terms a *grant de novo*, and that a grant may be made by law as well as by a patent pursuant to law.

The act of June 21, 1860, confirmed to the claimant, Preston Beck, Jr., the entire tract, as recommended by the surveyor general, without any limitation as to quantity, or other condition whatever.

Plaintiff in error cites *U. S.* v. *Flint*, 4 Sawy. 61, as supporting his position in favor of the validity of the survey. In concluding the opinion, Justice FIELD of the supreme court said: "The courts can only examine into the correctness of a survey when, in a controversy between parties, it is alleged that the survey made infringes on the prior rights of one of them, and can then look into it only so far as may be necessary to protect such right." The right here alleged is a prior one, and we are asked to look into the survey only so far as to protect such prior right. The attorney of record for the plaintiff in error filed no brief. The only authorities presented were submitted by the United States attorney. The facts stated in the record were stipulated and filed in the court below. We have had our attention called to no case of a similar character arising under the act of July 22, 1854. The decision of the courts referred to under the California acts of 1851 and 1860 afford us very little aid in construing the powers of the surveyor general of New Mexico under the act of 1854. We have kept in view the fact that, at the date of the survey, November, 1860, some of the claimants were minors, while others were married women, who would not be bound by the act of the surveyor general to their prejudice, unless it was the evident and very clear intention on the part of congress. of the United States to give the survey the effect claimed here. We do not think it was the intention of congress to confer any such power by the enactment of that statute.

Finding no error in the record, the judgment of the court below will be affirmed.

LONG, C. J., and BRINKER, J., concur.